## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| WEST PALM BEACH FIREFIGHTERS' PENSION FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SCANA CORPORATION, KEVIN B. MARSH, JIMMY E. ADDISON, and STEPHEN A. BYRNE,<br><br>Defendants. | Civ. A. No.   3:17-3141-MBS<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff West Palm Beach Firefighters' Pension Fund ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by SCANA Corporation ("Scana" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Scana; and (d) other public information regarding the Company.

## INTRODUCTION

1.      This securities fraud class action is brought on behalf of purchasers of Scana's publicly traded securities from January 19, 2016 to October 30, 2017, inclusive (the "Class Period"). The claims asserted herein are alleged against Scana and certain of the Company's current and former senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Scana, headquartered in Cayce, South Carolina, is a holding company principally engaged in the distribution and sale of electricity and natural gas to customers in the Southeast U.S.  In 2008, Scana began to construct two nuclear reactors at the Company's Virgil C. Summer ("V.C. Summer") nuclear generating station in Fairfield County, South Carolina.  These nuclear reactors would be the first new nuclear plants to be built in the U.S. since the 1980s.  Scana had a 55% stake in the project, with Santee Cooper (a South Carolina-owned utility company) owning the remaining 45%.  Scana selected Westinghouse to serve as the chief contractor for the project.

3.     In order to help offset the costs of the construction of the reactors, Scana lobbied South Carolina lawmakers to pass a law known as the Base Load Review Act ("BLRA").  Under the BLRA, Scana may petition South Carolina regulators to increase customer rates to cover the costs associated with construction of the reactors, so long as the Company acts prudently when managing the project.  Scana used the BLRA to increase customer rates nine times, amounting to a total rate increase of at least $1.7 billion.

4.     Throughout the Class Period, Scana represented that construction of the reactors was progressing well and that, even though the Company faced challenges, it was able to work though the problems.  Scana also represented that it was acting prudently when working on the nuclear project, and was therefore able to generate significant revenues by increasing customer rates under the BLRA, and thereby offset a significant portion of its construction costs.

5.     These statements were materially false and misleading.  In truth, Defendants knew that the reactors were "not constructible" and that the V.C. Summer project suffered from a host of other fundamental issues that were far more serious than disclosed to investors.  Defendants' knowledge was based in part on a comprehensive, 132-page report that Scana commissioned from expert consultants Bechtel Corporation in 2015 (the "Bechtel Report").  The Bechtel Report

highlighted the formidable obstacles to the completion of the V.C. Summer project, the massive

cost overruns Scana was incurring, and the Company's imprudent management of the project.

6.      Investors learned the true scope of the problems that Scana faced constructing the

reactors through a series of disclosures beginning on February 14, 2017.  On that day, the parent

company of Westinghouse, Toshiba, announced a $6.3 billion write-down related to its nuclear

program and reported that it may sell Westinghouse, calling into question the continued viability

of the V.C. Summer project.  On this news, the price of Scana stock declined from $70.03 per

share on February 13 to $66.86 per share on February 14, or almost 5%.

7.      On July 27, 2017, Scana announced that the cost to complete the new nuclear

reactors would materially exceed the Company's prior estimates.  This news caused the price of

the Company's stock to decline from $65.64 per share on July 27 to $61.29 per share on July 28,

or approximately 7%.  Just days later, on July 31, Scana announced that it would abandon the V.C.

Summer project.

8.      Soon thereafter, on September 4, 2017, South Carolina Governor Henry McMaster

publicly released the Bechtel Report.  According to the report, which was dated February 5, 2016,

"there [were] significant issues facing the project," including: "plans and schedules [that] are not

reflective of actual project circumstances;" a lack of "project management integration needed for

a successful project outcome;" "a lack of shared vision, goals and accountability;" an engineering

design which "is not yet completed" and "not constructible;" an "oversight approach [that] does

not allow for real-time, appropriate cost and schedule mitigation," and other "various fundamental

[engineering, procurement and construction], and major project management issues."

9.      On September 21, 2017, Scana announced that the U.S. Attorney's Office in South

Carolina and the FBI had initiated a criminal investigation into Scana's representations regarding

its ability to construct the nuclear reactors. On this news, the price of the Company's stock declined from $57.80 per share on September 20 to $55.22 per share on September 22, a two-day decline of 4%.

10.     On September 26, 2017, the South Carolina Office of Regulatory Staff called for the suspension of $37 million per month in rate hikes and the return of $1.7 billion that Scana's customers have already been charged, citing allegations that Scana failed to disclose information that would have provided a basis for challenging the rate increases. This news caused the price of Scana stock to drop from $55.57 per share on September 26 to $51.22 per share on September 27, or almost 8%.

11.     Then, on October 28, 2017, reports emerged that Scana's CEO, Kevin Marsh, and Executive Vice President, Stephen Byrne, had been fired by the Company's Board of Directors. On October 30, Defendant Marsh denied reports that any member of Scana's executive management had been fired or resigned. The next day, on October 31, before the market opened, Scana announced that Marsh and Byrne resigned amid the criminal investigations into Scana's representations regarding the V.C. Summer project. On this news, the price of Scana stock declined from $46.50 per share on October 27 to $43.14 per share on October 31, or approximately 7%. The disclosures regarding Scana's misconduct caused investors in the Company's securities to suffer significant losses.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.

§ 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Scana maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff West Palm Beach Firefighters' Pension Fund ("Plaintiff") is a pension fund based in West Palm Beach, Florida that provides retirement benefits for firefighters.  As of September 30, 2016, Plaintiff managed total assets in excess of $189 million on behalf of nearly 500 current employees, retirees and beneficiaries.  Plaintiff purchased Scana securities on The New York Stock Exchange ("NYSE") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

15.     Defendant Scana is incorporated in South Carolina and maintains its principal executive offices at 100 SCANA Parkway, Cayce, South Carolina 29033.  Scana, through its subsidiaries, provides electricity and natural gas to customers in the Southeast U.S.  One of the Company's principal operating subsidiaries is South Carolina Electric & Gas Company ("SCE&G").  In 2008, SCE&G entered into an engineering and procurement contract for the construction of two new nuclear reactors to be built at the site of the V. C. Summer Nuclear Station near Jenkinsville, South Carolina.  Scana's common stock trades on NYSE, which is an efficient

market, under ticker symbol "SCG."  As of October 31, 2017, there were approximately 143 million shares of Scana stock outstanding.

16.    Defendant Kevin B. Marsh ("Marsh") was, at all relevant times, Scana's President, Chairman of the Board, Chief Executive Officer, and Chief Operating Officer until his resignation on October 31, 2017.

17.    Defendant Jimmy E. Addison ("Addison") was, at all relevant times, Scana's Chief Financial Officer.

18.    Defendant Stephen A. Byrne ("Byrne") was, at all relevant times, Scana's Executive Vice President and SCE&G's President - Generation and Transmission and Chief Operating Officer until his resignation on October 31, 2017.

19.    Defendants Marsh, Addison, and Byrne are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Scana, possessed the power and authority to control the contents of Scana's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## BACKGROUND

20.    Scana's primary business is the generation, transmission, distribution and sale of electricity and natural gas to approximately 1.6 million customers in South Carolina, North Carolina, and Georgia.  In February 2006, Scana announced a plan to construct two nuclear reactors at the Company's V.C. Summer facility in South Carolina.  Construction of the reactors, which Scana described as Units 2 and 3, began in 2008.  At the time, the V.C. Summer nuclear station was one of just two nuclear plants being built in the U.S. and the first brand-new station since the 1980s.  It was based on a new design from Westinghouse, a division of Toshiba, that was supposed to avoid the cost-overruns and delays that have hampered the nuclear power industry for years.

21.    In order to help fund the construction of the reactors, in 2007, Scana successfully lobbied South Carolina lawmakers to pass a bill known as the Base Load Review Act ("BLRA").  The BLRA allows Scana to petition South Carolina regulators to increase the rates the Company charges customers to cover costs associated with the nuclear project.  Significantly, the rate hikes take effect before the reactors are built, and remain in place even if the nuclear construction project fails or is never completed.  The BLRA also allows Scana to petition South Carolina regulators to recover costs associated with the abandonment of the project, should it be unsuccessful.  Critically, the BLRA only allows Scana to recover such costs if its management of the project is prudent.

22.    Since Scana began construction at V.C. Summer, the Company has experienced significant delays and cost overruns associated with the construction of the reactors.  These cost overruns led to Scana increasing the rates of utility customers nine times to support construction of the nuclear project.  Rate increases under the BLRA totaled at least $1.7 billion.  Scana downplayed the extent of the issues at V.C. Summer, falsely stated that construction of the reactors

was progressing well and better than expected, and that the Company was successfully achieving critical milestones with regard to the project. Scana also misrepresented that it was acting prudently when working on the nuclear project, and was therefore able to generate significant revenues to offset its costs by increasing customer rates under the BLRA.

## DEFENDANTS DEFRAUD INVESTORS

23.    On January 19, 2016, the first day of the Class Period, Scana issued a press release and video "Highlighting a Year of Progress for V.C. Summer Units 2 and 3." The press release touted the "achievement" of several "milestones" for "V.C. Summer," stated that "[t]he nuclear construction team concluded the year on a high note," and noted that "mechanical modules were also taking shape" while "work continued steadily on the construction site."

24.    The statements set forth in ¶23 were materially false and misleading. In truth, Scana's construction of the V.C. Summer project was an unmitigated disaster. The designs for the reactors were simply "not constructible," and the schedules for the project were "not reflective of actual project circumstances," which resulted in significant delays and cost overruns. Further, Scana's nuclear construction team improperly relied on unlicensed workers, and employed an oversight approach that "does not allow for real-time, appropriate cost and schedule mitigation."

25.    On February 26, 2016, Scana filed its 2015 Annual Report on Form 10-K with the SEC. In that report, Scana stated that South Carolina regulators approved a schedule for the construction of the V.C. Summer nuclear reactors as well as capital cost estimates for those reactors, which reflects that the project is "useful for utility purposes, and that the capital costs associated with the [reactors] are prudent utility costs and expenses and are properly included in rates." Scana further stated in the Form 10-K that the total estimated project cost to complete the

project ranged from $7.1 to $7.6 billion, and that Unit 2 would be substantially complete by August 2019 and Unit 3 would be substantially complete by August 2020.

26.     The statements set forth in ¶25 were materially false and misleading.  In truth, the Company's capital cost estimates and scheduling forecasts for the nuclear project were not based in reality.  In addition, the V.C. Summer project suffered from fundamental problems arising from Scana's imprudent management of the project and, as such, the costs associated with the construction of the reactors were not properly included in customer rates.

27.     On March 28, 2016, Defendant Marsh sent a letter to shareholders stating that "we continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project and our recent initiative to offer renewable energy to our customers."

28.     On April 28 2016, Scana held its earnings conference call for the first quarter of 2016.  On that call, Defendant Byrne told investors that Scana's contractors were "doing a tremendous job" building the V.C. Summer reactors, and that construction was progressing "better than expected."

29.     On July 28, 2016, Scana held its earnings conference call for the second quarter of 2016.  During the conference call, Defendant Byrne told investors that the construction schedule for Units 2 and 3 remained on track, and that the reactors' "guaranteed substantial completion dates remained" the same.  Byrne further assured investors that there would not be any dramatic changes despite a recent change in subcontractors for the V.C. Summer project.

30.     On September 21, 2016, at the "V.C. Summer Media Day 2016," Defendant Marsh further reiterated Scana's ability to construct the nuclear reactors and act in a prudent manner.  Specifically, according to Defendant Marsh, "[w]ell they say well if you could do it again, would

you make the same decision? And absolutely I would make the same decision. I feel as strongly today, probably even stronger today, than I did back in 2008 that this is the solution for us for a clean energy future." Marsh further stated that "with projects of this nature, you're gonna have some challenges . . . but we've been able to meet those challenges, make adjustments to the contract, and continue progress on the project." Marsh reiterated at the V.C. Summer Media Day 2016 that "we're excited about where we are, we've had challenges, we've been able to work through those challenges." Also at the V.C. Summer Media Day 2016, Defendant Byrne stated that "[t]he pace of this project is quickening. Though we have run into some issues and roadblocks in the past, most of those issues and roadblocks are behind us."

31.     On October 27, 2016, Scana held its earnings conference call for the third quarter of 2016. On that call, Defendant Byrne told investors that Scana's new subcontractor was able to rectify staffing issues that had developed and that the subcontractor is "doing a good job, they're trying some innovative things. . . We are very happy with what [the subcontractor] is doing for us. They've been very successful recently."

32.     The statements set forth in ¶¶27-31were materially false and misleading. In truth, Scana knew, but concealed from investors, that the designs for the reactors were not constructible and that the project had no reasonable prospect for completion. Scana's contractors were encountering major problems constructing the reactors, falling behind schedule, and incurring significant cost overruns. In fact, Scana "did not have an appropriate controls team to assess/validate [] reported progress and performance," utilized schedules that were not reflective of actual circumstances, and relied on unlicensed workers to design the reactors. As such, Scana's management of the project was anything but prudent.

33.    On February 14, 2017, Toshiba disclosed that it would take a $6.3 billion write-down related to its U.S. nuclear program and announced that it may sell Westinghouse—the unit building the V.C. Summer plants for Scana.  According to Mizuho analyst James Von Riesemann, "Scana's construction consortium with [] Westinghouse may not be economically viable any longer, leaving the construction of two new nuclear units to fall into Scana's lap," and that Scana may not have enough funds to see the project through completion.  To assuage investors' concerns, Scana immediately issued a press release on February 14 stating that it "Receive[d] Reaffirmation from Westinghouse Regarding Completion of VC Summer New Nuclear Project" and that Westinghouse was "committed to completing the project."    Nevertheless, the questions surrounding the completion of the project caused the price of Scana stock to decline from $70.03 per share on February 13 to $66.86 per share on February 14, or almost 5%.

34.    On February 16, 2017, Scana held its earnings conference call for the fourth quarter and full year of 2016.  During the conference call, Defendant Marsh stated that "we still anticipate completing our two new nuclear units" and that "we are making substantial progress on these new plants."  Marsh further assured investors that we "remain focused on continued progress toward their completion.  Again we will continue to monitor this situation closely and will alert you if we are made aware of any changes."

35.    Also on February 16, Defendant Byrne assured investors that Scana would still reach its "2020 deadline" for completion of Unit 2 because "efficiency factors have increased significantly," things were "going much, much more smoothly," and that "we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us."

36.     The statements set forth in ¶¶34-35 were materially false and misleading.  In truth, Scana was not anticipating completing the V.C. Summer facility on time and was failing to monitor the construction of the reactors.  There were no "efficiency factors" that would allow for the timely completion of Unit 2 and, to the contrary, the Company's imprudent management of the project was causing significant delays and cost overruns.

37.     On February 24, 2017, Scana filed its 2016 Annual Report on Form 10-K with the SEC.  In that report, Scana stated that South Carolina regulators approved a schedule for the construction of the V.C. Summer nuclear reactors as well as capital cost estimates for those reactors, which reflects that the project is "useful for utility purposes, and that the capital costs associated with the [reactors] are prudent utility costs and expenses and are properly included in rates."  Scana further stated in the Form 10-K that the total project capital cost for the reactors ranged from $6.8 billion to $7.7 billion.  The Company also told investors that the "approved construction schedule designates contractual guaranteed substantial completion dates of August 31, 2019 and August 31, 2020 for Units 2 and 3, respectively, although recent communications from [Westinghouse] indicate substantial completion dates of April 2020 and December 2020 for Units 2 and 3, respectively."

38.     The statements set forth in ¶37 were materially false and misleading.  In truth, the Company's capital cost estimates and construction schedules for the V.C. Summer project lacked any rational basis.  The construction of the nuclear reactors was also plagued by various fundamental problems caused by Scana's imprudent management of the project.  Accordingly, the costs associated with the construction of the reactors were not prudent utility costs and were not properly included in customer rates.

12

39.     Scana's assurances that Westinghouse would complete the project were revealed to be empty promises when, on March 29, 2017, Westinghouse filed for bankruptcy citing the rising costs associated with constructing the V.C. Summer plants.  On July 27, 2017, Scana announced that the cost to complete both reactors at the power plant "will materially exceed" prior estimates. The news of the increased costs of the project caused the price of the Company's stock to decline from $65.64 per share on July 27 to $61.29 per share on July 28, or approximately 7%.

40.     Days later, on July 31, 2017, Scana announced that it would abandon construction of the reactors altogether.  The Company claimed that this decision followed a comprehensive evaluation process that was triggered by the Westinghouse bankruptcy.  Based on the evaluation, Scana claimed that it had only recently determined that completing the project would be prohibitively expensive—costing roughly $26 billion to complete.  According to CEO Kevin Marsh, "[w]e arrived at this very difficult but necessary decision following months of evaluating the project from all perspectives to determine the most prudent path forward.  Many factors outside our control have changed since inception of the project.  Chief among them, the bankruptcy of our primary construction contractor."  Scana also told investors that it will utilize the BLRA in order to recover costs spent on the project, and reaffirmed its guidance.

41.     The statements set forth in ¶40 were materially false and misleading.  In truth, Scana knew at least as early as February 2016—over a year prior to Westinghouse's bankruptcy— that the V.C. Summer project was an abject failure and that completing the nuclear project would cost multiples more than represented to investors.

42.     On August 2, 2017, *The Post and Courier* published an article titled "S.C. lawmakers want SCANA stockholders to eat costs of two failed nuclear reactors."  According to the article, South Carolina lawmakers condemned Scana and claimed that "they will investigate

how to stop the executives and investors of Scana—the parent company of [SCE&G]—from charging customers between $2 billion to nearly $5 billion in costs over the next 60 years for the wasted concrete, steel and labor pumped into the unfinished reactors."  On August 4, South Carolina Attorney General Alan Wilson announced that he was opening an investigation and State Senate leaders called for a special legislative session to investigate Scana's abandonment of the nuclear project.  In response to these announcements, the price of Scana stock declined approximately 5%, from $67.15 per share on August 2 to $63.79 per share on August 4.

43.    *The Post and Courier* published an article on August 10, 2017, titled "CEO: SCANA may not return to scuttled nuclear project—even if a new partner emerges."  The article reported on Defendant Marsh's comments to state lawmakers that "he wasn't sure he would want to take the project back up after it fell years behind schedule and its costs soared billions of dollars over budget."  On this news, the price of Scana stock fell approximately 2%, from $62.01 per share on August 10 to $60.69 per share on August 11.

44.    On August 31, 2017, *The Post and Courier* published another article titled "Secretive report on South Carolina nuclear reactor construction never given to state utility regulators."  According to the article, Scana "may have misled state utility regulators about the existence of a secretive report that detailed construction failures at two troubled nuclear reactors at the V.C. Summer station in Fairfield County, months before the $9 billion energy project was abandoned."  Scana initially told South Carolina lawmakers that it did not have a copy of any supposed report that expert consultants Bechtel Corp. prepared regarding construction problems at V.C. Summer.  Then, Scana admitted that it had the report, but claimed that it was legally privileged information and could not be disclosed.

45.     South Carolina Governor Henry McMaster released the secret, 130-page Bechtel report on September 4, 2017.  According to the report, Scana knew at least as early as February 2016 that the V.C. Summer project "suffer[ed] from various fundamental" contract and management problems, yet the Company continued to tout the progress being made on the construction of the reactors and advocate for additional funding for a project that had no reasonable prospect for completion.  Significantly, Bechtel told Scana in the February 2016 report that the designs for the reactors were simply "not constructible" and that the schedules for the project were "not reflective of actual project circumstances."  The report also described how Scana's "forecasts for schedule durations, productivity forecasted manpower peaks and percent complete do not have a firm basis," and how the Company employed an oversight approach that "does not allow for real-time, appropriate cost and schedule mitigation."  Bechtel further described in its report that Scana does "not have an appropriate project controls team to assess/validate Consortium reported progress and performance," and that Scana improperly relied on unlicensed workers to design the project.

46.     On September 21, 2017, Scana revealed that the U.S. Attorney's Office in South Carolina and the FBI had begun a criminal investigation into whether Scana misrepresented its ability to complete the V.C. Summer project.  On this news, the price of the Company's stock declined from $57.80 per share on September 20 to $55.22 per share on September 22, a two-day decline of 4%.

47.     South Carolina House leaders asked the State Law Enforcement Division on September 25 to investigate Scana for possible "criminal fraud" after the utility operator abandoned the two partially built nuclear reactors.  According to lawmakers, "it has become our belief that the proximate cause of the V.C. Summer collapse is a direct result of misrepresentation

by Scana. . . . We also believe that criminal fraud through the concealment of material information is also a plausible cause for the project's disastrous collapse."

48.     On September 26, 2017, the South Carolina Office of Regulatory Staff called for the suspension of $37 million per month in rate hikes and the return of $1.7 billion that Scana's customers have already been charged, citing allegations that Scana failed to disclose information that would have provided a basis for challenging the rate increases.  This news caused the price of Scana stock to drop from $55.57 per share on September 26 to $51.22 per share on September 27, or almost 8%.

49.     Then, on Saturday, October 28, 2017, *FITSNews* reported that CEO Marsh "has been forced from his post" and "told SCANA board members on Saturday that he would step down as chief executive officer of the company."  *FITSNews* also reported that Defendant Byrne was similarly "forced out on Saturday."  Two days later, on Monday, October 30, Marsh denied reports that he was leaving Scana.  According to Marsh, "[t]he board did not take any action over the weekend to remove me or any other members of management.  Neither I, nor any member of senior staff, have been terminated, or have any of us resigned or retired."  The next day, on October 31, before the market opened, Scana announced that Defendants Marsh and Byrne resigned amid the mounting criticism of and government investigations into Scana's imprudent management of the nuclear project.  On this news, the price of Scana stock declined from $46.50 per share on October 27 to $43.14 per share on October 31, or approximately 7%.

## **LOSS CAUSATION**

50.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Scana securities and operated as a fraud or deceit on the Class.

Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on February 14, 2017, July 27, 2017, August 2-4, 2017, August 10, 2017, September 21, 2017, September 26, 2017, and October 28-30, 2017, the price of Scana securities fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Scana securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the securities of Scana during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Scana and their families and affiliates.

52.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of October 31, 2017, there were approximately 143 million shares of Scana stock outstanding, owned by hundreds or thousands of investors.

53.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.     Whether Defendants violated the Exchange Act;

B.     Whether Defendants omitted and/or misrepresented material facts;

C.     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.      Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.      Whether the price of Scana securities was artificially inflated;

F.      Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.      The extent of damage sustained by Class members and the appropriate measure of damages.

54.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

55.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

56.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## **INAPPLICABILITY OF STATUTORY SAFE HARBOR**

57.     Scana's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  Indeed, those warnings were themselves misleading because they presented as potential risks conditions that already existed or were known to be imminent when the warnings were made.

58.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Scana who knew that the statement was false.  None of the historic or present tense statements

made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

59.    At all relevant times, the market for Scana's securities was an efficient market for the following reasons, among others:

A.    Scana stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

B.    As a regulated issuer, Scana filed periodic public reports with the SEC and NYSE;

C.    Scana regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.    Scana was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

60.    As a result of the foregoing, the market for Scana securities promptly digested current information regarding Scana from all publicly available sources and reflected such information in the price of Scana securities.  Under these circumstances, all purchasers of Scana

securities during the Class Period suffered similar injury through their purchase of Scana securities at artificially inflated prices and the presumption of reliance applies.

61.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding problems with the construction of the nuclear reactors at Scana's V.C. Summer facility—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the V.C. Summer facility, as set forth above, that requirement is satisfied here.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Scana securities at artificially inflated prices.

64.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for Scana securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

66.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Scana's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

68.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Scana securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Scana securities had been artificially inflated by Defendants' fraudulent course of conduct.

69.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

70.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

71.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

72.    The Individual Defendants acted as controlling persons of Scana within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Scana, the Individual Defendants had the power and ability to control the actions of Scana and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

73.    WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may

deem just and proper.

## JURY DEMAND

74.      Plaintiff demands a trial by jury.

DATED: November 17, 2017

*/s/ Joshua C. Littlejohn*
Marlon E. Kimpson (D.S.C. Bar No. 7487)
William S. Norton (D.S.C. Bar No. 11343)
Joshua C. Littlejohn (D.S.C. Bar No. 10426)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
mkimpson@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com

*Local Counsel for Plaintiff*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Gerald H. Silk
Avi Josefson
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Plaintiff*